CITY OF NEWARK, A MUNICIPAL CORPORATION OF THE
STATE OF NEW JERSEY, PLAINTIFF, v. COUNTY OF
ESSEX, ESSEX COUNTY BOARD OF CHOSEN FREE-
HOLDERS, MACLYN S. GOLDMAN, TREASURER OF THE
COUNTY OF ESSEX, DEFENDANTS.

Essex County Court

October 25, 1976.

568

*Mr. John C. Pidgeon,* Assistant Corporation Counsel, for plaintiff (*Mr. Milton A. Buck,* Corporation Counsel, attorney).

*Mr. Joseph C. Glavin, Jr.;* Assistant County Counsel, and *Mr. Charles P. Cohen,* Assistant County Counsel, for defendants (*Mr. Francis Patrick McQuade,* Essex County Counsel, attorney).

FEINBERG, J. C. C. This suit was instituted by the City of Newark against the County of Essex, Essex County Board

of Chosen Freeholders, and Maclyn Goldman, Treasurer of the County of Essex (hereinafter county) and was tried before the judge sitting without a jury. The city relies upon *N. J. S. A.* 2A:48–4 in this action for reimbursement for certain expenses incurred allegedly as the result of a riot or riots, said to have commenced in the city on September 1, 1974.

At trial it was shown that the disturbances which underlie this law suit began on September 1, 1974. On that date a festival was held in Branch Brook Park, located in Newark, Essex County. The festival was attended by large numbers of Americans of Puerto Rican and Hispanic origin. During the course of the festivities some participants were observed to be gambling, consuming alcohol and selling food, each of which constituted a violation of Essex County Park regulations. Although the Essex County Park police did not attempt to arrest anyone for these violations, altercations arose in connection with the drinking and gambling. As a result, the park police became more closely involved in the situation.

Shortly thereafter an incident took place between a mounted Essex County Park policeman and persons among the crowd of participants. Some of these people became violent, throwing objects at the park police; park policemen became trapped in the crowd and had to be rescued. An official vehicle which stalled in the park was set on fire and destroyed. At this time the Essex County Park police withdrew from the park and Newark police moved in.

Whether the Newark police moved in without request from the Park police, and under their own authority, to preserve order is not clear. But that issue is not necessary to the disposition of this case.

When the Newark police moved in, force was met with force, and the situation became uncontrollable. There were approximately one thousand persons in the park during the disturbances. The mayor as well as the police and fire of-

ficials were summoned to Branch Brook Park. In the hope of diffusing the situation, the mayor offered to meet with a contingent from the crowd at City Hall, where grievances related to the situation in the park would be discussed.

The crowd then marched to City Hall, accompanied by the mayor and an escort of Newark police. The crowd re-assembled outside City Hall on Broad Street. Persons purporting to represent the crowd then met the mayor, who agreed to meet with another committee the next day. The crowd then dispersed.

By this time the mayor had directed his police and fire officials to take all steps necessary to protect lives and property in the city. As a result of this order, police and firemen were placed on overtime shifts, and all leaves and holidays were cancelled.

The next day, the morning of September 2, 1974, a crowd reappeared outside City Hall. While the mayor met with representatives, others from among the crowd delivered speeches which inflamed the crowd. As the day wore on the situation deteriorated. The crowd occupied the outside of City Hall, some persons hanging from the building's canopies. City Hall became the target of bottles, stones and various missiles in general. When police attempted to disperse the crowd, which numbered approximately one thousand, it spilled into Broad Street, occupying that thoroughfare. Businesses were threatened by the uncontrollable crowd.

Fire bombings were reported among the incidents in other parts of the city. Evidence presented indicated that these problems continued for a week. There were 184 fires, including 82 incendiaries reported during the period of September 1 through 8, 1974. A comparison with figures from the previous year revealed a dramatic increase for this time frame. The pattern of disorder continued, including fires and damage to property, until September 14, 1974.

The following matters are to be determined by the court:

    (1) Was there a riot for the purposes of *N. J. S. A.* 2A:48–4?

    (2) Were there reimbursable expenses within the contemplation of *N. J. S. A.* 2A:48–4 and, if so, to what extent?

    (3) Should the county be allowed to prove negligence by the city for the purpose of reducing reimbursable expenses under *N. J. S. A.* 2A:48–4?

The city bases its action for reimbursement upon *N. J. S. A.* 2A:48–4 (hereinafter § 4), which reads as follows:

> The mayor or officer or sheriff shall upon receiving the notice take all legal means to protect the property attacked or threatened. The expenses incurred by any of such officers in the performance of any duty hereby imposed shall be paid by the county treasurer of the county in which the property is situate, upon approval thereof by a judge of the county court of such county.

■ The article which includes § 4 is entitled "Property Loss from Mob Violence or Riots in General." On reading § 4 with the other sections within Article I of the act, it is clear that § 4 cannot become operative until it is shown that property, real or personal, was threatened by mob violence or riots, and the city acted upon notice of such threat.

■ Although a riot has not been defined in a case dealing specifically with § 4, the term has been interpreted in a case dealing with *N. J. S. A.* 2A:48–1, *A & B Auto Stores, etc. v. Newark*, 106 *N. J. Super.* 491 (Law Div. 1969), aff'd 59 *N. J.* 5 (1971). The Supreme Court has indicated that its interpretation of a riot, for the purpose of *N. J. S. A.* 2A:48–1, would be applicable to all seven sections within Article 1 of the act. *Manzo v. Plainfield*, 107 *N. J. Super.* 303 (Law Div. 1969), aff'd 59 *N. J.* 30 (1971).

The Supreme Court's interpretation of a riot, as set forth in *A & B v. Newark*, and reiterated in *Manzo v. Plainfield*, came as a result of the massive disorders experienced by those two cities in 1967. The statute which this court pres-

ently has before it had been attacked as unconstitutionally vague in that it did not define a riot. In particular, the problem the Supreme Court had before it in both *A & B v. Newark* and *Manzo v. Plainfield* was that the disorders were of such magnitude as to be, it was urged, beyond the outer limits of a riot for the purposes of *N. J. S. A.* 2A:48–1 to 7. If an underlying objective of this act were the imposition of community responsibility for certain criminal events stemming from a riot, where the riot was directed at overthrowing the national government, the imposition of community responsibility under this act might well constitute a nugatory gesture. Therefore, the Supreme Court excluded from its limited definition of a riot for the purposes of this act, a movement intended to overthrow the government at the one extreme and an ordinary criminal event undertaken for some private gain at the other extreme.

* * * "Mob" and "riot", however difficult to define, are lay terms and connote something more than and different from a joint violation of a penal statute. Usually there is present an element of reaction to or protest because of some political, social, racial, ethnic, or economic issue which affects the rioters in a common way. Although we are reluctant to say the common cause must always be of that character, we think it correct to say that its absence would lead a court to consider carefully whether the participants could be said to constitute a mob or the event a riot in the lay sense of those words.

* * * (T)he trial court distilled "the conclusion that a riot is simply a tumultuous disturbance of the peace by a group of three or more persons having a common purpose who act in concert to accomplish their purpose through force or violence."

(Citation omitted) * * * We modify that definition to stress (1) that the number of participants must be sufficient to constitute a mob in the lay sense of that word; (2) in addition to the violent and tumultuous character of the event, it must appear that the disturbance operated to the terror of the people. * * * [*A & B Auto Stores, etc. v. Newark*, 59 *N. J.* at 17–18]

■ This court holds that there was a riot within the meaning of the Supreme Court's interpretation in *A & B v. Newark*. The totality of the circumstances shows that a tumultuous disturbance took place involving approximately 1,000

persons. These people acted in concert. Their initial purpose related to festival conditions in Branch Brook Park. Subsequently, at City Hall, their purpose became more generally related to socio-political issues. This mob exceeded an ordinary criminal undertaking in its purpose, but it did not constitute a mob seeking to overthrow the government. The disturbance operated to the terror of the people, threatening and in some cases destroying property. The city had actual notice of this threat, and the mayor lawfully acted on such notice. The threat from the riot lasted from September 1 through September 14, 1974.

█ Section 4 does not include within its ambit of possible reimbursement all damages occasioned by a riot. Whatever the city's liability to individual property owners may be under other sections of the act, there is no right to reimbursement from the county for such a liability incurred, under § 4.

█ There is, however, a right created by § 4 to reimbursement for expenses incurred in protecting such property attacked or threatened, regardless of whether that property was in fact destroyed or damaged. It would be clearly absurd and counterproductive to condition reimbursement under § 4 upon the actual destruction or damage of property.

█ On September 1, 1974 the mayor properly determined that a riot condition existed and that this condition presented a threat to property within the city. As a result he authorized that legal means be taken to protect property, and expenses were incurred by the police and fire departments in implementing this legal order. These expenses are recoverable from the county for the duration of the threat to property from the riot or riots.

██ This claim for reimbursement is based on a statute which is in derogation of common law; therefore, it must be strictly construed. See *Hinkes v. Newark*, 120 *N. J. Super.* 600 (Cty. D. Ct. 1972). The parties agree that under *N. J. S. A.* 2A:48-4 the court is sitting purely as a ministerial officer. As such, the court cannot question the judgment lawfully exercised by city officials, once it has been determined

that their judgment was exercised in response to a riot which threatened property in Newark from September 1 through 14, 1974.

The city has proven expenses in connection with its duty to protect property as set forth in § 4. These expenses are $395,823.16, which represents salaries paid to police personnel over and above normal expenses for the period, and $29,688.51, which represents salaries paid to fire department personnel over and above normal expenses for the period.

■ The county suggested that the records presented for the purpose of substantiating these figures were incomplete in that they did not detail exactly which piece of property was being protected at the time of the expenditure. Apart from the court's belief that such a showing is unnecessary and unreasonable without some evidence of irregularity, the court reiterates that these expenditures may not be questioned by a court which sits as a ministerial officer for the purposes of § 4.

■ Therefore, the court holds that the city has proved reimbursable expenditures of $425,511.67. This figure constitutes overtime pay of police and fire personnel for the period of September 1 through 14, 1974. Because this statutory action is not a "tort action" within the statute providing for interest on judgment in tort actions, the city is not entitled to interest on this judgment. *Hinkes v. Newark, supra* at 604.

During the trial the county sought to introduce evidence that the city was negligent in its handling of the riot, and that this alleged negligence should be considered by the court for the purpose of reducing the city's reimbursable expenses.

■ It has been pointed out that the statute at bar must be strictly construed. Therefore, the court is placed within clearcut confines in hearing this case. There is no mention of negligence in § 4. The word appears in the statute only in those sections which relate to actions between individual

property owners and a city, for property destroyed or damaged by a riot. In order for the court to justify a showing of negligence in this action between the city and the county for expenses incurred in protecting property, the court first would have to redraft § 4 by interpretation so as to include a negligence clause. This would be beyond the court's jurisdiction as set forth in § 4, and it would be beyond a strict construction of the terms of this section.

It is clear that a determination of the degree of control exercised by the Newark police in dealing with the rioters pursuant to the mayor's order, the legality of which has not been challenged, is not a proper issue in this case.

Likewise, the mayor's judgment in inviting the mob to City Hall in an effort to diffuse the riot is not subject to review by this court.

Apart from the requisite application of a strict construction of § 4 which precludes the court from hearing arguments on the issue of the city's purported negligence, it is noted that recent cases which have discussed the general area of judicial interference with executive action have undertaken examination where the totality of the circumstances indicated some issue of bad faith or arbitrariness, or some willful violation of the law. See *Anderson v. Sills*, 56 *N. J.* 210 (1970), and *In re Ringwood Fact Finding Committee*, 65 *N. J.* 512 (1974). In the case at bar we have nothing more than an allegation of negligence. Even if the court had the power under § 4 to review the mayor's judgment, and even assuming the county could prove its allegation with expert testimony, the court would not be justified in interfering with an executive decision during a riot, on an allegation of negligence.

The court notes that it has not been asked to, and could not properly decide whether the underlying purpose of *N. J. S. A.* 2A:48–4 is well served today when the effect of its application here will be to make the residents of Essex

County's suburbs pay for services rendered to the citizens of Newark during a riot in that city.

Judgment is entered in favor of the City of Newark, in the sum of $425,511.67. Interest is not awarded.